Charles A. MEYER, Plaintiff,

v.

AMERADA HESS CORPORATION,
Defendant.

Civ. A. No. 82–816.

United States District Court,
D. New Jersey.

May 28, 1982.

As Amended June 7, 1982.

Robert A. Russell, Phillipsburg, N. J., for plaintiff.

Stephen E. Barcan, Wilentz, Goldman & Spitzer, P. C., Woodbridge, N. J., for defendant.

## OPINION

DEBEVOISE, District Judge.

Plaintiff, Charles A. Meyer, instituted this action against Amerada Hess Corporation seeking injunctive and declaratory relief and damages on account of a new gasoline station Dealer Agreement which Hess required that he execute in August, 1981. The First Count of the complaint seeks relief under the Petroleum Marketing Practices Act of 1978, 15 U.S.C. § 2801 et seq. (the "PMPA"). The Second Count seeks relief under the New Jersey Franchise Practices Act, N.J.S.A. 56:10–1 et seq. The Third and Fourth Counts allege state common law claims.

Plaintiff applied for a preliminary injunction enjoining Hess from enforcing the rent obligation of the new Dealer Agreement and requiring Hess to continue its franchise relationship with him under the terms of prior agreements between the parties. Hess has moved for summary judgment on alternative grounds. First, Hess asserts that there is no federal jurisdiction under the Act since there has been neither a nonrenewal nor termination of plaintiff's franchise relationship, a prerequisite for a federal claim. It would follow, Hess argues,

that since there is no federal claim there is no basis for the exercise of pendent jurisdiction over the state law claims. Second, assuming the Act is applicable, Hess argues that on the basis of the undisputed facts it is not liable as a matter of law under either federal law or state law.

A hearing was held and this constitutes my findings of fact and conclusions of law.

### Findings of Fact

Hess, a refiner and marketer of petroleum products, sells gasoline at retail at "gasoline only" stations under the brand name "Hess". It operates through lessee-dealers who lease their station properties from Hess and purchase gasoline from it, and through company-operated stations which are operated by managers and attendants employed by Hess. In December, 1968 plaintiff became a lessee-dealer at Hess station # 30270, located at Main Street and Willow Grove Avenue in Hackettstown, New Jersey. He had previously been a lessee-dealer at a Hess station in Jersey City. He operated from 1968 until December 1, 1981 (the effective date of the new Dealer Agreement at issue in this case) pursuant to a Dealer Lease dated December 20, 1968 and a Dealer Franchise and Sales Agreement dated December 19, 1968. Since December 1, 1981 plaintiff has operated under the new Agreement, which he signed on August 21, 1981. The circumstances of his signing that agreement will be described below.

Hess owns the underlying land for approximately 55% of the lessee-dealer stations, and controls it under long-term leases with third parties for approximately 45% of those stations. All of the real estate expenses relating to the properties are borne by Hess. Thus, Hess is responsible for all property taxes on the lessee-dealer stations and Hess bears the rental on the ground leases of those properties which it controls under long-term leases. None of the lessee-dealers has made any capital investment in the station properties. However, each devotes his time, energy, talents and resources to developing customers and good will at the location where he conducts his business. This good will has value and may command a significant price if a lessee-dealer transfers his franchise. Hess owns the capital improvements and bears the cost of constructing the service station building and of purchasing and installing the improvements located thereon, including the pumps and dispensers, tanks, plumbing, lighting, and the pavement. Hess maintains the stations. The lessee-dealers' principal expenses are the operating costs of the station (employee compensation, some light maintenance such as light bulbs, painting, landscaping, paper supplies, etc.) and the rental paid to Hess. They must, of course, pay for the gasoline which they sell.

Historically, the rent paid by Hess' lessee-dealers was determined by the volume of gasoline which Hess sold to the station. Commencing in the late 1960's until mid-1976, the rental formula was as follows: 1 cent per gallon from 0 to 60,000; 1½ cents per gallon from 60,000 to 150,000; 1¾ cents from 150,000 to 200,000 gallons; and 2 cents per gallon over 200,000. In mid-1976 Hess modified this formula through an optional rent program whereunder the per gallonage formula was reduced to 1 cent per gallon up to 200,000 and 1½ cents per gallon over 200,000, and a minimum rental was instituted to protect Hess against dealers whose sales fell significantly below what Hess considered the potential of their stations. The mid-1976 rent program was optional, the dealers being free to accept or reject the new formula. If they rejected it they remained under the pre-existing ascending gallonage formula, as plaintiff elected to do.

As Hess' economist, Dr. Marcus, noted, the cents per gallon formula for establishing rent was popular among both oil companies and dealers generally until the late 1970's. It had the virtue of administrative simplicity and it appeared to gear rents to a dealer's ability to pay. However, as Dr. Marcus pointed out, there were at least two undesirable economic effects of utilization of this formula. First, particularly in recent years when the value of service sta-

tions and the cost of capital increased, high gallonage dealers were, in effect, subsidizing low gallonage dealers. This often resulted in the high gallonage dealer having a lower margin (because of the cents per gallon rent escalation) and being less able to pay. Second, the cents per gallon system introduced a distorting factor into pricing decisions of individual dealers.

Recent economic changes made the cents per gallon formulas undesirable from the perspective of the oil companies. As mentioned above, after 1970 the market value of dealer facilities increased and the cost of capital also increased dramatically. For example, if in 1970 a facility had a value of $100,000 and the cost of capital was 8%, a reasonable return might be $8,000 a year. If the value of the same facility were $300,000 in 1981 and the cost of capital were 15% in that year, a reasonable return would be in the neighborhood of $45,000 a year. In fact, however, by reason of the decline in gasoline sales and application of the cents per gallon rent formulas, the oil companies' return on their dealer facilities in the form of rent declined as their value and the cost of capital increased.

During the period when the oil companies devised and implemented the cents per gallon formulas, they were less concerned with the economics of individual stations. Their primary concern was the sale of large quantities of gasoline and the profits to be derived from such sales. Now, however, under very different economic conditions, they have become concerned with individual gasoline station economics. Hess' actions which precipitated this action reflect that concern.

Commencing with the Arab oil embargo in the fall of 1973, the price of crude oil and thus the price of gasoline rose dramatically, and gasoline consumption declined. This had the effect of causing Hess' aggregate rental income, linked as it was to the amount of gasoline purchased by the lessee-dealers, to decline some 56% from a high of $7.1 million in 1973 to just over $3 million in 1980.

The monthly rents which plaintiff paid reflect this over-all trend:

| | |
|---|---|
| 1970—$2,400 | 1976—$1,309 |
| 1971—$3,072 | 1977—$1,574 |
| 1972—$3,649 | 1978—$1,716 |
| 1973—$2,500 | 1979—$1,775 |
| 1974—$1,973 | 1980—$1,259 |
| 1975—$1,736 | 1981—$1,359 |

While Hess' rental income from its lessee-dealer properties was declining during the aforesaid period, Hess' costs of owning, leasing and maintaining the station properties were escalating. Hess' profit margins on sale of product to its dealers was frozen by federal law. Dealers, however, were permitted by federal law to increase their margins of profit—from 1974 to 1979 they were allowed to add 3 cents per gallon to their 1973 margin and, beginning in 1979, the government allowed a maximum dealer profit margin of 15.4 cents per gallon (later increased to 16.1 cents per gallon and other higher amounts).

On March 6, 1981 Norman Goldberg, the Senior Vice President of Marketing for Hess, recommended that Hess restructure its dealer rentals, the formula for which had remained virtually unchanged since the late 1960's. As a result of that recommendation Hess adopted the following two-phase program to restructure dealer rentals:

Phase I—Elimination, effective April 1, 1981, of certain temporary voluntary rental adjustments ("TVRAs") which had been granted in November, 1978 and in March, 1979.

Phase II—Establishment of a flat monthly rental based on the value of the land and improvements at the lessee-dealer stations. Hess claims that it endeavored to adopt a system-wide rent formula which could be applied uniformly to all lessee-dealers and which, on an aggregate basis, would produce a more reasonable rental to Hess from the stations. Hess further claims that in order to avoid charges of discrimination by any of its lessee-dealers and to achieve the uniform application of the program it de-

termined not to engage in any individual negotiations once each dealer's rental was established pursuant to the aforesaid formula.

To determine the market value of the land (as if unimproved) at each station property, Hess engaged an independent real estate appraiser, Britton Appraisal Associates, Inc., to appraise all lessee-dealer lands at their highest and best use. With the assistance of local appraisers (Thomas P. Welch, in the case of plaintiff's premises), a written evaluation was prepared for each station property based, in large part, on sales of comparable properties. A determination of the value of the improvements at each lessee-dealer station was based upon the replacement cost thereof; this was determined from an on-site inspection and an inventory of each stations' improvements, and the replacement cost of these items was derived from a construction manual containing geographically adjusted figures for such work (e.g., labor rates adjusted for different parts of the United States).

The third element of the rental formula—the percentage to be applied to the market value of the land and improvements to determine the annual rental for each station—was selected after Hess performed a series of calculations at 6%, 8%, 9%, 10%, 11% and 12%, analyzing the resulting rentals at each figure. Hess selected the 8% factor, which returned Hess' aggregate rental income to the approximate absolute dollar position which it enjoyed in 1976, that is to say, without adjustment for inflation or increased expenses. Hess had analyzed the impact of the 8% rate and concluded that it would result in a rent under which most of its dealers could operate profitably.

Hess had 224 lessee-dealers in August, 1981, when plaintiff was required to execute his new Dealer Agreement. The new rental formula resulted in 146 of these lessee-dealers receiving rent increases and 78 receiving rent decreases. The percentage range of increases was as follows:

| Percentage Range of Dealer Rental Increases | Number of Dealers who Signed New Agreement and Had Rental Increases |
|---|---|
| 0 – 24% | 28 |
| 25 – 49% | 16 |
| 50 – 74% | 13 |
| 75 – 99% | 10 |
| 100 – 199% | 12 |
| 200 – 299% | 12 |
| 300 + | 8 |

On or about July 27, 1981, Hess presented 141 of its lessee-dealers, including plaintiff, with new Dealer Agreements containing a flat monthly rental based on the uniform application of Hess' new rental formula. The remaining approximately 80 dealers have been or are being notified of the new rental terms as their agreements come up for renewal.

Hess prepared carefully for the presentation of the new rental program to its dealers. Anticipating litigation, it was guided by its legal counsel at each step.

Counsel prepared a July 27, 1981 letter to be sent to each Hess dealer. It announced that a new Dealer Agreement had been prepared which would contain, among other things, a revised rental structure. It stated, "[r]ental will no longer be paid on a gallonage basis or, as is the case in certain agreements, on a gallonage basis subject to a minimum, but will be paid at a fixed rate per month". The letter did not disclose how the fixed rate was computed but assured the dealers that: "The proposed changes in rental structure are being introduced to all dealers at this time in accordance with a uniform approach, equally applied, after a careful study by the Company of dealer rentals and represent what we have determined to be a proper rental for the property." The letter concluded with the statement that "[i]n the event that we cannot agree on the terms of this proposed agreement by August 24, 1981, Amerada Hess will have no alternative but to provide you with a notice of nonrenewal of your existing agreement".

The Hess legal department prepared a step-by-step procedure to be followed when Hess' representatives (two in number) visit-

ed the dealers to present the July 27, 1981 letter and the Dealer Agreement. This procedure was reviewed with the persons who were to make the visits and it emphasized that there was to be no discussion or conjecture with the dealers as to how the rent was determined. The persons making the visits were not told what the new rent formula was.

Subsequently, after the initial visits to dealers had been made and resulted in a not surprising flood of inquiries, Hess' legal department recommended advising the dealers of the manner in which the rent had been computed. An August 6, 1981 memorandum instructed that upon the request of a dealer for information about the new rents they be informed:

All rents were based upon the following:

1. The value of the improvements on the premises.

2. An independent appraisal of the value of the real estate.

3. A uniform percentage applied to the above factors to arrive at the rent.

In conformity with the procedures established by Hess' legal department, Hess' District Manager presented the July 27, 1981 letter and the new Dealer Agreement to plaintiff during the first week of August, 1981. The new agreement provided for a monthly rental of $2,318, as compared to an average monthly rental for 1981 of $1,359. Unbeknownst to plaintiff at the time, the new rental was based on an asserted fair market value of $175,000 for the land underlying the service station property and an asserted replacement value of $172,668.89. The new agreement also required plaintiff to keep his service station open twenty-four hours a day unless he obtained a waiver of that requirement.

In 1981, when plaintiff's rent averaged $1,359 per month, Hess' monthly real estate expenses (taxes and ground rent) averaged $1,453 and its monthly maintenance expenses averaged $453, for a total of $1,906 per month.

Plaintiff was told, in effect, that he had to take the agreement as written or leave it. He was told he could sign it then or take time to review it with his attorney. Plaintiff did consult with his attorney.

On or about August 25, 1981 Arthur D. Watkins of Hess visited plaintiff to obtain a signed Dealer Agreement. Plaintiff questioned Watkins carefully, and in response to these questions Watkins informed him that he was running a good station, that Watkins was not authorized to negotiate terms and he did not know anyone at Hess who was so authorized, and that if plaintiff did not deliver a signed agreement he would be terminated. During the course of the discussion Watkins read to plaintiff the August 6, 1981 prepared statement as to the method by which the new rents were calculated. That, of course, did not provide plaintiff with information as to the value attributed to the real estate on which his station was located, the reproduction costs of the improvements he used, or the percent applied to the total of the two amounts.

Wishing to keep his station, plaintiff signed and delivered the Dealer Agreement under protest. Thereafter, he obtained a waiver of the twenty-four hour requirement. He paid the new rent from December, 1981 through March, 1982.

On March 29, 1982 Hess implemented a 20% TVRA retroactive to March 1, 1982 for all dealers operating under the new agreement, and plaintiff was later mailed a refund check for that 20%. This TVRA was a reaction by Hess to the unanticipated but severe decline in the retail gasoline market which developed in early 1982. Under this TVRA plaintiff's monthly rent declined to $1,854 per month. This compares with $2,022 which is the average monthly amount which Hess now pays for real estate expenses and maintenance for the property.

Plaintiff contends that Hess' rent restructuring program is not being undertaken for legitimate business purposes. Rather, plaintiff contends, it is a subterfuge designed to drive Hess' independent dealers out of business and to replace them with company-owned and operated outlets.

In support of this contention plaintiff relies on a number of circumstances.

Plaintiff points to the decision Hess made in late 1973 not to install lessee-dealers in any new station which it might build or acquire or in stations which were voluntarily returned to Hess by any dealer. Existing dealers were not affected by the decision. The reason Hess gave for the decision was that state franchising statutes made it very difficult to terminate dealers whose performance was marginal and that this, together with the threat of litigation by dealers terminated for good cause, made it unattractive to turn over the large investments which dealerships entailed to new untried dealers.

Plaintiff advances three other arguments to establish that the purpose of the Dealer Agreement presented to him was to put him out of business: (i) He cannot operate profitably if he pays the new rent; (ii) The land value used to calculate the new rent was greatly inflated; and (iii) The reproduction costs of his equipment were greatly inflated.

As to plaintiff's future profitability, Hess' witnesses testified that they concluded that plaintiff should be able to show a profit over a period of time notwithstanding the new rent. They noted that the gasoline industry is subject to great unpredictability and that circumstances will arise which will result in periods of losses. One such period moved Hess, in March, 1982, to give its dealers an across-the-board rent reduction of 20%. However, according to Hess, over the long run plaintiff should be able to carry on his business.

Plaintiff, on the other hand, testified that he cannot possibly survive if he is required to pay the new rent. Neither side presented detailed financial analyses to support its conclusion, and I cannot make a definitive finding on this issue.

Hess based its land valuation of $175,000 on an appraisal of James A. Britton, Jr. and Thomas P. Welsh. They concluded that the highest and best use of the land was for a high volume, gasoline only station. Five sales which they considered comparable were adjusted to arrive at the market value of the subject property.

Plaintiff countered with an appraisal by Douglas P. Pitchell. Using a cost approach and a market data approach he arrived at a market value of the land and building of $150,000. He concluded that the land alone was worth $80,164.50. Pitchell challenged Welsh's opinion that real estate values were rising substantially in Hackettstown, New Jersey, a factor used by Welsh to adjust his comparable sales. Further, in Pitchell's opinion the highest and best use of the subject property is not the high volume sale of gasoline only. Rather, in his opinion, the highest and best use is for a multi-service facility, *i.e.*, a station which combines the sale of gasoline with the sale of other products and the repair and maintenance of vehicles. Therefore, his comparable sales were sales of such service stations, which produce much lower prices. He agreed that major oil companies would pay more for sites used as so-called "pumper stations" (such as the Hess facilities) than they would for service stations, but he urged the dubious proposition that such use is not the highest and best use "because it is not a normal situation or sale".

Hess computed the reproduction cost of plaintiff's building and improvements to be $172,668.89. This was done in a detailed and highly sophisticated manner and gives every appearance of great accuracy. Plaintiff's real estate expert, Douglas P. Pitchell, arrived at an undepreciated reproduction cost of $112,692.41. Hess' Vice President in charge of computing the reproduction costs of all the dealer stations noted a number of rather glaring errors in Pitchell's computation which accounted for the discrepancy. There was a $5,000 error in the cost of curbing. Concrete items costing $10,000 were omitted. Other items costing $12,700 were omitted. Pitchell used the wrong square foot area for the building. Pitchell omitted the electrical contract. Pitchell's over-all approach to estimating the reproduction cost of the building was to use a square foot calculation—a rough approach indeed. Hess based its estimate on the actual structure and materials used in the building.

For the purposes of plaintiff's application for a preliminary injunction, I find that Hess' estimates of fair market value and reproduction costs are accurate and that plaintiff's estimates are not. For summary judgment purposes, however, it cannot be said that no issue of fact exists as to these estimates.

The rental figure for plaintiff's station did not ultimately depend upon the fair market value of the real estate and the reproduction costs of the improvements. Those figures were only stepping stones in arriving at the rent figure. As will be recalled, once Hess had obtained those figures for all of its dealers it applied to them a percent which it believed would allow its dealers generally to conduct their businesses profitably. Thus, the use of land and improvement values was a mechanism for insuring uniformity of treatment as between dealers, and the selection of a percentage figure was the means for setting the amount of the rent.

Hess relied upon the testimony of Dr. Marcus, a rather impressive Rutgers professor of economics, to establish the reasonableness of the rent which the formula produced for plaintiff's gasoline station. In his opinion, rent should allow for a reasonable rate of return on the property rented. A reasonable rate of return would include a return on capital plus occupancy costs.

In the present situation Dr. Marcus noted that Hess' monthly occupancy costs alone ($859 for taxes and maintenance and adjusted ground rents [1] of $1,488, for a total of $2,347) exceed the rent paid by plaintiff under the new Dealer Agreement.

At the present time, given current interest rates, Dr. Marcus concluded that 15% is the lower end of the spectrum for the rate of return which would be reasonable for this kind of property. Applying that rate of return to plaintiff's expert's valuation of the property of $150,000, Dr. Marcus obtained the figure $22,500, to which he added annual occupancy costs of $10,308. Divid-

ing the total of $32,808 by 12, he arrived at a reasonable monthly rate of return on investment of $2,734—again a figure higher than plaintiff's new rent.

A rent based on gallonage does not address itself to the resources devoted to a business. Historically this did not appear to concern the oil companies, perhaps because the value of the land and improvements used by gasoline stations was low and the reasonable rate of return under prevailing money market conditions was also low by today's standards. Those conditions no longer prevail and Hess has decided that it will take into account something akin to reasonable rate of return when setting rents. As Dr. Marcus pointed out, when this new rent is put into effect the consequences may well be that some gasoline stations will fail financially.

After Hess introduced its new rents, 49 of its 224 lessee-dealers left their stations. They left for a variety of reasons. Some undoubtedly could not handle the new rents. However, 11 of the 49 dealers who left had been given rent decreases.

These are the facts on the basis of which it must be determined whether plaintiff is entitled to a preliminary injunction and whether defendant is entitled to summary judgment in its favor.

### Conclusions of Law

#### A. Jurisdiction

[1] Plaintiff asserts federal question jurisdiction, 28 U.S.C. § 1331, for his claims arising under the PMPA. The PMPA itself confers upon a franchisee a right of action in the federal court if a franchisor fails to comply with the requirements of the Act governing termination or nonrenewal of the franchise relationship. 15 U.S.C. § 2805.

Hess argues that 15 U.S.C. § 2805 gives a franchisee a right of action in the federal court only if he charges a wrongful franchise termination or nonrenewal, and that since the complaint in the present case does

---

1. The actual ground rents paid by Hess were adjusted upward to reflect the fact that Hess owns outright part of the land.

not charge termination or nonrenewal, wrongful or otherwise, the Court does not have federal question jurisdiction.

This argument can be given short shrift.

Under the well-established rule of *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), a cause of action premised upon a federal statute or the Constitution is subject to dismissal for lack of jurisdiction only if it is "wholly insubstantial", "frivolous" or "immaterial and made solely for the purpose of obtaining jurisdiction". *Id.* at 682–82, 66 S.Ct. at 776; *see also Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Hughes v. Local No. 11*, 287 F.2d 810 (3d Cir. 1961). Although Hess contends that plaintiff's claim does not fall within the scope of the PMPA because there was no termination or nonrenewal, "the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy". *Bell v. Hood, supra*, 327 U.S. at 682, 66 S.Ct. at 776. Plaintiff has clearly stated a sufficiently substantial claim under the PMPA to sustain the exercise of this Court's jurisdiction.

The Court clearly has jurisdiction to decide this case under 28 U.S.C. § 1331 and 15 U.S.C. § 2805. That being so, it is also appropriate to exercise pendent jurisdiction over the state law claims arising out of the same factual circumstances. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

B. *Preliminary Injunction*

■ 15 U.S.C. § 2805(a) provides that "[i]f a franchisor fails to comply with the requirements of section 2802 [general prohibition against termination or nonrenewal] ... the franchisee may maintain a civil action against such franchisor". Hess would argue, in line with its jurisdictional argument, that unless there is a termination of a franchise or nonrenewal of the franchise relationship a franchisee has no remedy under 15 U.S.C. § 2805. In other words, it would be Hess' contention that if a franchisee is forced to accept a franchise

agreement which is unlawful under the PMPA he has no cause of action, and it is only if he refuses to accept such a franchise agreement and the franchisor then failed to renew the franchise relationship that he has a cause of action. The language of § 2805(a) conferring the right of action is not so narrowly drawn. I conclude that if, in fact, the terms which Hess presented to plaintiff in August, 1981 were in violation of the PMPA, plaintiff has a cause of action under § 2805 even though he signed the new Dealer Agreement containing those terms.

However, the fact that plaintiff signed the Dealer Agreement and is operating as a franchised Hess dealer may affect the showing which he must make in order to obtain injunctive relief.

In the ordinary case in order to obtain a preliminary injunction the moving party must demonstrate (i) a reasonable probability of ultimate success on the merits, (ii) irreparable injury, (iii) absence of overriding harm to other interested persons, and (iv) the absence of countervailing public interest considerations. A lesser burden is imposed upon persons seeking an injunction under 15 U.S.C. § 2805(b)(2). *E.g., Kesselman v. Gulf Oil Corp.*, 479 F.Supp. 800 (E.D.Pa.1979). That section provides:

(2) Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

Read literally, the injunction provisions of § 2805(b)(2) apply only to the termination or nonrenewal situations. Preliminary injunctive relief in other circumstances constituting a violation of the PMPA (such as those alleged in the present case) would be available only if the plaintiff met the more stringent requirements normally applicable to such relief.

In the present case I need not decide which burden plaintiff must meet in order to obtain injunctive relief, because I have concluded that he has not met the lesser § 2805(b)(2) burden. There do not exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation.

The provision of the PMPA applicable to the Dealer Agreement which Hess presented to plaintiff is 15 U.S.C. § 2802(b)(3)(A). It provides:

> (3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:
>
> (A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—
>
> (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
>
> (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

The validity of the terms upon which Hess insisted are to be judged by Hess' intent rather than upon its effect upon plaintiff, although, of course, totally irrational provisions might bear upon a franchisor's good faith. As one court stated:

> In essence, then, the legislative history suggests that courts have been directed to look to the franchisor's intent rather than to the effect of its actions. If it is only using proposed changes to the lease to disguise an illegal attempt to discriminate against the franchisee and thereby drive him from business, the court is em-

powered to interfere. If, on the other hand, a good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace alone will govern the transaction. This interpretation is completely in accord with the perceived abuse which Congress sought to rectify.

*Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1119 (D.Conn.1980).

■ The fact that new terms are presented on a take it or leave it basis does not constitute a lack of good faith. A showing that the terms are applied without discrimination to all dealers rather than selectively to the complaining franchisee is strongly indicative that there is no intent to cause the termination or nonrenewal of that franchisee. *Palmieri v. Mobil Oil Corporation*, 529 F.Supp. 506 (D.Conn.1982). *Cf.*, *Wesley v. Mobil Oil Corp.*, 513 F.Supp. 227 (E.D.Pa.1981); *Sexe v. Husky Oil Co.*, 475 F.Supp. 135 (D.Mont.1979).

In the present case the evidence produced by Hess demonstrates that Hess devised the new rental formula in good faith for sound business reasons and in the normal course of its business. The formula has every appearance of being reasonable viewed in the light of Hess' over-all operations. Some dealers benefited from it; some, like plaintiff, did not. All, however, were required to pay rents having a relationship to the capital which they were using in their businesses. There is no showing whatsoever that plaintiff was treated differently from other dealers, and I do not believe he even argues that he was.

■ The fact that since 1973 Hess has had a policy of not installing lessee-dealers in new stations or in stations returned to Hess simply cannot support an inference that the terms which Hess offered plaintiff were intended to prevent the renewal of the franchise relationship so that the station could become company operated. For the purposes of the application for a preliminary injunction I find that Hess' valuation of the land and its computation of reproduction costs were reasonably accurate and

that plaintiff's valuation and computation were off the mark. As pointed out in *Munno* and *Palmieri*, the fact that the new rent provisions may make the station unprofitable is not of itself determinative of an improper purpose.

In a recent case, *Tiller v. Amerada Hess Corporation*, 540 F.Supp. 160 (D.S.C.1981), plaintiffs sued Hess to enjoin termination of their leases for failure to pay the increased fixed rents resulting from the same rent revision program which is the subject of the present case. The Court concluded "from the manner in which the new rent structure was formulated, from the policy decisions of Hess concerning the phasing out of dealer operated stations, and from the manner in which the proposed lease agreement was promulgated, it can be reasonably inferred that the new rental structure in the proposed lease agreement was a mere subterfuge and that Hess acted in bad faith in attempting to force the dealer-operator/Plaintiffs out of business contrary to the intent and purpose of the P.M.P.A.", p. 165. On the basis of that finding the Court issued a preliminary injunction.

It would appear that I have before me a much more extensive record than was available to the Court in South Carolina. The record before me would not support the finding quoted above. In fact, it compels a contrary conclusion.

I conclude, therefore, that there do not exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation. Plaintiff's application for a preliminary injunction will be denied.

## C. Summary Judgment

■ Hess has moved for summary judgment under *Fed.R.Civ.P.* 56, asserting that there is no genuine dispute as to any material fact and that Hess is entitled to judgment as a matter of law.

The facts have been set forth in detail above. They are undisputed except for three matters: (i) whether plaintiff can operate profitably when paying the new rents; (ii) whether the value of the gasoline station land appraised at its highest and best use is in the area of $175,000 or in the area of $80,164.50, and (iii) whether the reproduction cost of the gasoline station improvements and equipment is in the area of $172,668.89 or in the area of $112,692.41.

The undisputed facts establish conclusively that the development of Hess' new rent formula was done in the normal course of its business and there is nothing to show that it was not applied uniformly without discrimination to all the dealers.

Plaintiff attacks Hess' good faith in implementing the new rent formula, asserting that it is designed to eliminate dealers. As I have mentioned above, the fact that Hess has had, since 1973, a policy of not installing lessee-dealers in new stations or in stations surrendered by dealers cannot, of itself, establish an intent to use the new rents to eliminate independent dealers.

Plaintiff urges (and for present purposes I assume he is correct) that he is unable to make a profit under the new rents. This, he argues, tends to establish an improper purpose. A similar contention was rejected in *Munno* and *Palmieri* and it was rejected in *Bellmore v. Mobil Oil Corp.*, 524 F.Supp. 850 (D.Conn.1981), *aff'd without op.*, 672 F.2d 899 (2d Cir. 1981).

Plaintiff further urges that his appraisals demonstrate that Hess placed an excessively high value on the land on which his gasoline station is situated and on the improvements. Assuming this to be correct, there is nothing to dispute Hess' proofs that all gasoline stations were evaluated in the same way. Further, Hess did not apply to these figures current reasonable rates of return on capital to obtain a rent figure. It is undisputed that Hess applied a percent which it believed would increase rents to a figure which was nearer but not as high as a reasonable rate of return on capital but which, at the same time, would not prevent its dealers generally from operating profitably. That percentage, 8%, is far below current reasonable rates of return on capital. The testimony of Hess' economist, Dr. Marcus, is undisputed that even if one accepts

plaintiff's value for the land and his reproduction cost for the improvements, the rent which he must pay is significantly below a reasonable rate of return on the value of the land, improvements and equipment made available to him.

Thus, the facts which plaintiff disputes are not material to the outcome of this case. Assuming that those factual issues were resolved in the manner he urges, Hess nevertheless would be entitled to a judgment in its favor on the First Count alleging a cause of action under the PMPA. *Munno v. Amoco Oil Co., supra.*

■ The PMPA provides that "no State . . . may continue in effect any provision of any law . . . with respect to . . . the nonrenewal . . . of any such franchise relationship unless such provision . . . is the same as the applicable provision of this subchapter". 15 U.S.C. § 2806(a). Thus, the PMPA preempts the law in this field. To the extent that New Jersey's Franchise Practices Act, N.J.S.A. 56:10–1 *et seq.*, or its common law would produce different results in this case, they are of no effect. Consequently, Hess is entitled to summary judgment on the Second, Third and Fourth Counts of the complaint.

Hess' attorneys are requested to submit a form of order denying plaintiff's application for a preliminary injunction, denying Hess' motion to dismiss for lack of subject matter jurisdiction, and granting Hess' motion for summary judgment on all Counts of the complaint. In view of the disparity in the economic resources of the parties, no costs will be allowed.