**Abrams SHELL, et al., Plaintiffs,**

**v.**

**SHELL OIL COMPANY, Equilon Enterprises, L.L.C., Motiva Enterprises, L.L.C., and Equiva Services, L.L.C., Defendants.**

**Civil Action No. H–01–3366.**

United States District Court,
S.D. Texas,
Houston Division.

July 30, 2002.

Paul B. Rosen, Law Office of Paul Rosen, Bellaire, TX, John M. O'Quinn, O'Quinn & Laminack, Houston, TX, Thomas P. Bleau, Bleau, Fox & Associates, P.C., Los Angeles, CA, for plaintiffs.

J. Gregory Copeland, J. Michael Baldwin, Baker Botts, L.L.P., Houston, TX, Ann Spiegel, Senior Litigation Counsel, Shell Oil Co., Houston, TX, for defendants.

## *MEMORANDUM AND ORDER*

ATLAS, District Judge.

The Court has before it Defendants' Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act ("PMPA") Claims [Doc. # 42] ("Defendants' Motion"). Defendants'Motion has been fully briefed and is ripe for determination.[1] Having consid-

1. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act ("PMPA") Claims ("Defendants' Memorandum") [Doc. # 43]; Defendants' Reply to Plaintiffs' Memorandum of Law in Support of Their Opposition to Defendants' Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act ("PMPA") Claims ("Defendants' Reply") [Doc. # 45]; Defendants' Supplemental Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act ("PMPA") Claims ("Defendants' Supplemental Memorandum") [Doc. # 48]; Plaintiffs' Memorandum of Law in Support of Their Opposition to Defendants' Motion to Dismiss Plaintiffs' Petroleum Marketing Practices Act ("PMPA") Claims ("Plaintiffs' Memorandum") [Doc. # 44]; and Plaintiffs' Supplemental Memorandum of Law in Support of Their Opposition to Defendants' Motion to Dismiss Plaintiffs' PMPA Claims ("Plaintiffs' Supplemental Memorandum") [Doc. # 47].

ered the parties' briefs and applicable legal authorities, the Court concludes Defendants' Motion should be **granted.**

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiffs originally brought this action for injunctive relief, damages and declaratory relief for violations of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806, against Defendants Shell Oil Company ("Shell"), Equilon Enterprises, L.L.C. ("Equilon"), Motiva Enterprises, L.L.C. ("Motiva") and Equiva Services, L.L.C. ("Equiva") in the United States District Court for the Central District of California. On September 18, 2001, the California court granted Defendants' Motion to Transfer Venue and transferred the case to the Southern District of Texas.

The named Plaintiffs are gasoline service station dealers operating Shell-branded gasoline stations in California, Texas and New York under franchise agreements with either Equilon (for the California and Texas stations), or Motiva (for the New York station). These Plaintiffs have sued on behalf of themselves and others similarly situated who have received, or will receive in the future, renewal franchise agreements consisting of "Retail Facility Leases," "Retail Sales Agreements," and other related documents.[2]

Plaintiffs allege that the Retail Facility Leases and Retail Sales Agreements contain unlawful waivers, forfeitures, penalties, limitations of liability, reductions of the applicable statute of limitations governing claims against Defendants, unconscionable penalties in the form of liquidated damages, commercially unreasonable and excessive transfer fees and unreasonable restraints on alienation of the franchisee's interest in the franchise in the form of a unilateral consent clause giving Equilon, Motiva, or Equiva the unilateral right to approve or disapprove of a proposed sale or conveyance of the franchisee's interest in the franchises. Plaintiffs further allege that all of these provisions are not offered in good faith or in the normal course of business, but instead are designed to eliminate lessee-dealers in favor of company-operated stations, and thus violate the PMPA.

Plaintiffs contend that their allegations support a cause of action under the PMPA because the cover letter accompanying the renewal franchise agreements (attached as Exhibit E to the First Amended Complaint ("Cover Letter")) constitutes a "constructive termination" of their franchise relationship. The Cover Letter states:

> If you do not sign and return the Lease and other enclosed documents in a timely manner, be advised that Equilon will issue without further warning a non-rescindable notice of non-renewal pursuant to the terms of the Petroleum Marketing Practices Act.

## II. *LEGAL STANDARDS*

### A. *Motion to Dismiss Pursuant to Rule 12(b)(6)*

A district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle to relief," *Manguno v.*

2. Plaintiffs do not specify which of the named Plaintiffs actually have received the new agreements and accompanying cover letter. Plaintiffs attach to their First Amended Complaint an unsigned Retail Facility Lease and Retail Sales Agreement between Equilon and Plaintiff Abrams Shell, and between Motiva and Plaintiff Houda, Inc. However, the only cover letter attached to the First Amended Complaint is a January 2, 2001 letter from Equilon to Abrams Shell.

*Prudential Property and Cas. Ins. Co.*, 276 F.3d 720, 725 (5th Cir.2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus, the Court must determine whether the complaint states any valid claim for relief in the light most favorable to the plaintiff and with every doubt resolved in the plaintiff's behalf. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Manguno*, 276 F.3d at 725. However, the plaintiff must plead specific facts, not mere conclusory allegations or unwarranted deductions of fact, in order to avoid dismissal for failure to state a claim. *Collins*, 224 F.3d at 498.

### B. *PMPA Standards*

The PMPA regulates the termination and non-renewal of franchise relationships. 15 U.S.C. § 2801 *et seq.* Section 2802(a) of the PMPA prohibits termination or non-renewal of franchises except as provided in § 2802(b).[3] Section 2802(b) mandates that a franchisor may terminate a franchise or may decline to renew any franchise relationship only when (1) the notification requirements of 15 U.S.C. § 2804 are met,[4] and (2) the termination or non-renewal is based on specified grounds. *See* 15 U.S.C. § 2802(b)(1). One specific reason a franchisor may fail to renew a franchise is that the franchisee refuses to agree to changes or additions to a new franchise agreement and:

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

*Id.* § 2802(b)(3)(A).

The PMPA serves dual purposes. First, the PMPA increases "the bargaining strength of individual franchisees in the petroleum industry" by limiting and regulating the circumstances under which a franchisor may terminate or fail to renew a petroleum franchise. *Halder v. Standard Oil Co.*, 642 F.2d 107, 109–10 (5th Cir. 1981). Second, the PMPA gives franchi-

3. Section 2802(a) provides:

(a) General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 [which applies to trial and interim franchises] of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

15 U.S.C. § 2802(a). Subsection (b) of Section 2802 contains various grounds on which termination of non-renewal legitimately may be based.

4. Section 2804(c) provides:

(c) Manner and form of notification

Notification under this section—

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain—

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reason therefor;

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section.

sors the ability to exercise their business judgment and modify their franchise agreements without undue interference from the courts. *See Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 747 (1st Cir.1991); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989).

Under the PMPA's enforcement provision, a franchisee may maintain a civil action against a franchisor who fails to comply with the requirements of §§ 2802 and 2803. 15 U.S.C. § 2805(a). "In order to establish a claim under the PMPA, the plaintiffs must prove as a threshold matter a termination or non-renewal of their franchise relationship within the meaning of the PMPA." *Meghani v. Shell Oil Co.*, 115 F.Supp.2d 747, 752 (S.D.Tex.2000), *aff'd*, 273 F.3d 1098 (5th Cir.2001) (citing *Chestnut Hill Gulf, Inc.*, 940 F.2d at 748).

This case requires the Court to address Plaintiffs' proposed refinement of the standard for meeting the threshold requirement for a franchisee's suit in this Circuit.

## III. *ANALYSIS*

Defendants move to dismiss this case contending that Plaintiffs have not, and cannot, allege the termination or non-renewal of their franchise relationships. In support of their motion, Defendants rely primarily on this Court's decision, affirmed by the Fifth Circuit, in *Meghani v. Shell Oil Co.*, 115 F.Supp.2d 747 (S.D.Tex.2000), *aff'd*, 273 F.3d 1098 (5th Cir.2001). Defendants further contend that Shell and Equiva are not proper defendants because they are not "franchisors" under the PMPA.

Plaintiffs contend that they do not have to allege actual termination or non-renewal of the franchise relationship because the PMPA contemplates a claim based on constructive termination or non-renewal. Plaintiffs distinguish the instant case from *Meghani*.

The Fifth Circuit has not recognized claims based on "constructive termination" under the PMPA. *Meghani*, 115 F.Supp.2d at 757 (quoting *April Marketing & Distributing Corp. v. Diamond Shamrock Refining and Marketing Co.*, 103 F.3d 28, 29 (5th Cir.1997)). Nonetheless, Plaintiffs argue that "constructive discharge" case law in the Title VII employment context supports interpretation of the PMPA to allow constructive termination claims by analogy.

### A. *Application of Meghani to this Case*

This Court addressed the constructive termination issue at length in its *Meghani* opinion. The Court adopts and incorporates herein the reasoning and conclusions set forth in detail in *Meghani*. The *Meghani* plaintiffs argued actual termination under the PMPA as to three stations, and constructive termination as to fifteen others. The *Meghani* plaintiffs' actual termination claims involved stations operated on a month-to-month basis after their long-term leases expired. *Id.* at 752–53. The *Meghani* plaintiffs alleged that Shell's September 1999 letter that accompanied its proposed new dealer agreements stated that if a dealer failed to execute and return the new agreements by the deadline, a "request for renewal" would not be considered and that Shell would not "under any circumstances" renew the relationship for that station after the existing agreement expired. *Id.* at 754. The *Meghani* plaintiffs did not allege that Shell actually terminated the month-to-month arrangement or the entire franchise relationship. *Id.* The Court found that the September 1999 letter was a proposal and specified a possible future course of action; it was not an actual termination or non-renewal. *Id.* The Court further found, citing *Halder v. Standard Oil Co.*, 642 F.2d 107, 111 (5th Cir.1981), that a franchisor's failure to en-

ter into a new franchise agreement does not necessarily implicate the termination provisions of the PMPA: "The PMPA requires only that the franchise relationship, and not the franchise itself, be renewed." *Id.* at 755 (citations omitted). Accordingly, this Court held that the *Meghani* plaintiffs' Complaint was insufficient to state a claim for actual termination or non-renewal of a franchise relationship under the PMPA as to the three month-to-month stations. *Id.*

As to the fifteen other stations at issue in *Meghani*, the plaintiffs argued that constructive termination occurred when Shell allegedly refused to negotiate a new franchise agreement in good faith by making a "take it or leave it" offer, which required those plaintiffs to sign the proposed new agreements or forfeit their franchises, while Shell at the same time allegedly was in breach of its existing franchise agreements. *Id.* at 756. The Court refused the *Meghani* plaintiffs' request to expand existing PMPA case law to recognize constructive termination claims outside the franchisor assignment context. Because the PMPA explicitly permits the franchisor's assignment of its duties and resulting withdrawal from the franchise only when the franchisor's assignment is valid under both state law and the parties' franchise contracts, the Court found that a defined framework for a constructive termination claim exists in the statute in the franchisor-assignment context. *Id.* at 758–59. However, the Court further found that no such framework exists in the PMPA for constructive termination claims outside the franchisor-assignment context. As the Court explained:

> There is no requirement, at the time of renewal, that the specific provisions of underlying agreements within the franchise relationship be continued. Without a statutory underpinning, there is no workable definition or limitation on the proposed constructive termination theory in the nonassignment context. This Court does not sit as a one-person legislature. This ambitious cause of action cannot be created by a court in the absence of a clear legislative mandate or binding appellate judicial guidance.
>
> *   *   *   *   *   *
>
> The Court therefore declines Plaintiffs' invitation to dramatically expand the reach of the PMPA through the unwieldy vehicle of a constructive discharge theory that Plaintiffs seek to assert in this case. It is noted that the Court does not rule that there never can be a constructive termination claim. The Court merely concludes that a franchisee does not state a claim for constructive termination of the franchise relationship merely because the franchisee claims that the franchisor has imposed economic hardship on the franchisee through alleged breaches of one or more financial, lease or other duties under a contract within the franchise relationship while the franchisor is offering new franchise-related agreements.

*Id.* at 759–60.

In this case, Plaintiffs again ask the Court to recognize a cause of action under the PMPA based on a theory of constructive termination outside of the franchisor-assignment context. Here, Plaintiffs' claim of termination or non-renewal is based on the allegations that they "have received or will receive in the future" renewal franchise agreements the provisions of which violate the PMPA, and that the Cover Letter Plaintiffs allege accompanied or will accompany the renewal franchise agreements is a termination. The Cover Letter in the record states: "If you do not sign and return the Lease and other enclosed documents in a timely manner, be advised that Equilon will issue without further warning a non-rescindable notice of non-renewal pursuant to the terms of the Petroleum Marketing Practices Act."

Plaintiffs' Memorandum, at 2, 4–5; Exhibit E to First Amended Complaint. Plaintiffs contend that the Cover Letter language evidences Defendants' clear and unequivocal intent to terminate the Plaintiffs as dealers if the agreements were not signed "as is." Plaintiffs do not allege, however, that Defendants have actually issued a formal notice of non-renewal under § 2804 to any Plaintiff or that any Plaintiff's franchise relationship actually has terminated.[5] Plaintiffs do not assert breach of contract or other state law claims against Defendants. Plaintiffs "are suing because they were told, in no uncertain terms, sign the new renewal franchise agreements or face nonrenewal." Plaintiffs' Memorandum, at 12. Plaintiffs thus are asserting a "constructive termination" theory.[6]

The Court is unpersuaded by Plaintiffs' arguments. First, Plaintiffs who have not received renewal franchise agreements and the Cover Letter have not been given an ultimatum, even under Plaintiffs' basic theory. These Plaintiffs have not been told to sign the new renewal franchise agreements or face non-renewal. Here, there clearly has been no termination, constructive or otherwise. No cause of action exists for stations that merely anticipate termination, even if the Court were to accept some theory of constructive termination.

As to the single Plaintiff who has received the "as-is" Cover Letter, Abrams Shell, Plaintiffs attempt to distinguish *Meghani* on the grounds that the Cover Letter does not specify merely a possible, future course of action, but a definite plan of action.[7] Despite Plaintiffs' assertion that Defendants' intent is clear and unequivocal, Plaintiffs do not allege that Defendants have implemented the stated plan of action.[8] Plaintiffs' constructive termination theory fails also because it conflicts with the PMPA's remedial scheme.

The PMPA provides a statutory remedy to effect its purpose of protecting independent service station franchisees from arbitrary and discriminatory termination. *See May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989). A franchisee that has suffered a wrongful termination may file a civil action for damages pursuant to § 2805(a). Franchisors are required to provide a 90-day notice to a franchisee of the termination or non-renewal of the franchise relationship. 15 U.S.C. § 2804(a). During the 90-day waiting period, the franchisee may seek injunctive relief to stop the termination pursuant to the lessened standard for injunctive relief of § 2805(b). In this way, the PMPA protects franchisees not only from arbi-

5. Plaintiffs allege that the Cover Letter does not comply with the 90-day notice period required by § 2804(a)(2). The Cover Letter also does not meet the requirements of § 2804(c)(3)(B) and (C). *See supra* note 4.

6. The phrase "constructive termination" does not appear in Plaintiffs' First Amended Complaint. Nevertheless, Plaintiffs' Memorandum and Supplemental Memorandum make it clear that constructive termination is the theory Plaintiffs rely on in this case.

7. *See Meghani,* 115 F.Supp.2d at 754 ("Shell stated in the September 1999 letter that it would consider a request by the lessee-dealer to terminate its existing lessee-dealer arrangement if all the documents proffered with the letter were executed by both the lessee-dealer and Shell by a specified deadline. This communication was a proposal and specified a possible future course of action; it was not an actual termination or non-renewal. Plaintiffs nowhere in their Complaint allege that Shell actually terminated these three stations' month-to-month arrangements or the entire franchise relationship.").

8. Plaintiffs do not allege whether Abrams Shell, the Plaintiff who has received the Cover Letter, signed the renewal agreements, under protest or otherwise, or refused to sign and is operating month-to-month.

trary and discriminatory termination, but also from the harmful effects of threatened termination.[9] Because a franchisor cannot terminate without providing the requisite notice, threats of termination unaccompanied by explicit notice pursuant to § 2804 have no teeth. Once § 2804 notice is given, the franchisee has the protection of § 2805.[10]

This case is distinct from *Meghani* in that Plaintiffs allege that the new renewal agreements violate the PMPA, not that the franchisor is in breach of existing agreements. But, like *Meghani,* the Cover Letter on which Plaintiffs base their claim is not a § 2804 notice of termination or nonrenewal; it is a notice of some anticipated future course of action. The Court concludes that the circumstances alleged by Plaintiffs fail to support a legally viable constructive termination theory under the PMPA.

### B. *Analysis of Plaintiffs' Title VII Analogy*

Plaintiffs argue that in circumstances like those presented by the Cover Letter, the PMPA should be construed to permit suits based on a constructive termination theory in order to give effect to the intent and meaning of the PMPA. Plaintiffs point out that the PMPA does not use the limiting term "*actual*" to describe the type of termination that gives rise to a claim. Plaintiffs insist that in the absence of such limiting language, the Fifth Circuit would apply a standard of statutory construction that broadly defines "termination" to include "constructive termination." Plaintiffs cite the doctrine of constructive discharge in Title VII employment discrimination cases as an example of such statutory construction. Title VII's express terms make it unlawful "to discharge" an employee because of the employee's race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2(a)(1).

Like the PMPA, Title VII does not explicitly recognize a claim based on "constructive" discharge. However, the Fifth Circuit has judicially recognized a narrowly defined constructive discharge theory to effectuate the statute's purpose of remedying discrimination. *See, e.g., Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir. 2000); *Barrow v. New Orleans Steamship Assoc.,* 10 F.3d 292, 297 (5th Cir.1994); *Fowler v. Carrollton Public Library,* 799 F.2d 976, 980–81 (5th Cir.1986). Plaintiffs assert that the same principles should apply by analogy under the PMPA. Plaintiffs offer, however, no explanation why standards developed through years of case-by-case analysis in Title VII cases should be applied in the PMPA context, and cite no authority for doing so. The Court declines to create a new legal theory for recovery under the PMPA, at least in the circumstances presented here. The absence of a statutory foundation for such a claim creates a substantial hurdle for Plaintiffs.

9. Based on the following statement from the legislative history of the statute, Plaintiffs contend that in drafting the PMPA, Congress was as concerned about threats of termination as actual termination:

> Numerous allegations have been made before congressional committees investigating petroleum marketing problems that terminations and non-renewal, or threats of termination or non-renewal, have been used by franchisors to compel franchisees to comply with marketing policies of the franchisor.

S.Rep. No. 731, 95th Cong., 2 Sess. 15, *reprinted in* 1978 U.S.Code Cong and Admin.News 873, 876–77. However, because Congress was aware of the problem of coercive use of termination threats by franchisors, it easily could have included a remedy in § 2805 for wrongful threats of termination if it intended to create such a cause of action.

10. *See supra* note 4 for requirements of the § 2804 notice.

The meaning of the word "termination" is sufficiently clear.[11] Plaintiffs' constructive termination concept is at best ill-defined and would merely confuse an otherwise bright-line standard created by the PMPA for wrongful termination and non-renewal claims.

In addition to a lack of statutory underpinning, Plaintiffs' analogy to Title VII constructive discharge cases fails factually. The Fifth Circuit has recognized a constructive discharge claim only when an employee has been compelled to resign, and actually has resigned, due to intolerable working conditions. *See, e.g., Barrow,* 10 F.3d at 297. The accurate analogy in the PMPA context, therefore, would be to a franchisee who shut down its station because the franchisor caused conditions so onerous that the franchisee could not continue in business. The Court finds Plaintiffs' proposed analogy to be inapposite, at best.

Plaintiffs' position seeking a judicially created constructive termination theory also is contrary to the Fifth Circuit's well-established practice of abiding whenever possible by the plain meaning of statutory language. *See Uniroyal Chem. Co. v. Deltech Corp.,* 160 F.3d 238, 244 (5th Cir. 1998). The Fifth Circuit has stated that "the plain meaning of the [PMPA] does not provide for 'constructive termination.'" *April Marketing,* 103 F.3d at 29–30 n. 2 (citing *McGinnis v. Star Enter.,* No. 93-1234, 8 F.3d 20 (Oct. 21, 1993) (unpublished)).

Plaintiffs rely on the Sixth Circuit's endorsement in *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989), that "a liberal construction [of the PMPA is] consistent with its overriding purpose." That court also recognized, however, that the PMPA "should not be interpreted to reach beyond its original language and purpose." *Id.* Neither *May–Som,* nor Fifth Circuit authorities authorize the PMPA constructive termination theory Plaintiffs advocate. This Court does not have license to read a remedy into a statute that Congress did not enact. *See Meghani,* 115 F.Supp.2d at 760. Sections 2804 and 2805 provide adequate remedies for aggrieved dealers consistent with the balancing of interests the PMPA drafters intended to achieve. *See supra* at 640–41.

Under Plaintiffs' constructive termination theory, a franchisee that is still operating profitably could bring a claim for damages for alleged termination, even though the franchisee has suffered little or no injury. This is not a reasonable interpretation of the statute. The Court therefore declines to recognize a constructive termination theory where the franchisor has given no definite notice of termination or non-renewal pursuant to § 2804, and the franchise relationship is ongoing.

Plaintiffs have cited the Ninth Circuit case *Pro Sales, Inc. v. Texaco, U.S.A.,* 792 F.2d 1394 (9th Cir.1986), and the district court cases *Meyer v. Amerada Hess Corp.,* 541 F.Supp. 321 (D.N.J.1982), *Dean v. Kerr–McGee Refining Corp.,* 714 F.Supp. 1155 (W.D.Okla.1988), and *RKJ Enter., Inc. v. Sun Co., Inc.,* 1998 WL 833857 (E.D.Pa.1998), for the proposition that the PMPA creates a claim against franchisors for coercing franchisees to sign renewal agreements if the renewal terms violate the PMPA, even if the franchisee accepted and signed the renewal agreement under duress or protest. The Fifth Circuit has not adopted the reasoning or result of this line of cases.[12] No case cited by Plaintiffs

11. The definition of the transitive verb "to terminate" is: "to bring to end; put an end to." The Random House College Dictionary 1355 (Rev. ed.1980).

12. It is noted that the Fifth Circuit Court declined the opportunity to do so in the *Meghani* appeal.

is binding precedent on this Court. In any event, Plaintiffs' cited authorities do not supply persuasive support for Plaintiffs' PMPA constructive termination theory. First, none of the cited cases reconcile a constructive termination claim with the scheme of §§ 2804 and 2805 of the PMPA that imposes a 90-day waiting period during which termination cannot be effected and the franchisee is entitled to seek injunctive relief. Instead, Plaintiffs' cited cases appear to assume that, absent a claim for constructive termination, a franchisee who refuses to sign a renewal agreement because its terms violate the PMPA has no available remedy. *See, e.g., Pro Sales, Inc.*, 792 F.2d at 1399 ("We conclude that this congressional plan would be frustrated by requiring a franchisee to go out of business before invoking the protections of the PMPA.").

Second, none of the Plaintiffs' cases offers a reasoned analysis grounded in the language of the statute to support recognition of a constructive termination theory. In *Meyer*, the court admittedly gave "short shrift" to the argument that plaintiff failed to state a claim under the PMPA because there had been no termination or non-renewal.[13] 541 F.Supp. at 329. That Court also noted that § 2805(b)(2), "read literally," requires termination or non-renewal, but nonetheless, without explanation, considered the plaintiff's claim for injunctive relief. 541 F.Supp. at 330.

Also, there is no allegation in this case that any Plaintiff accepted the renewal agreements under protest while simultaneously bringing suit, as was the case in *Pro Sales*, 792 F.2d at 1396.[14] In fact, there are no allegations regarding what transpired after Abrams Shell received the "as is" Cover Letter. Thus, *Pro Sales* is factually inapposite.[15]

The Court concludes that Plaintiffs have not stated a claim for wrongful termination or non-renewal under the PMPA because they have not met the threshold requirement of alleging that their franchise relationships have been terminated or have not been renewed.

### C. *Shell and Equiva as Defendants*

Plaintiffs concede that their franchise agreements are with Equilon and Motiva. However, Plaintiffs allege that Shell and Equiva are the *alter egos* of Equilon and Motiva and therefore are subject to liability as franchisors under the PMPA. Defendants contend that Plaintiffs have asserted nothing more than conclusory allegations in support of their *alter ego* theory and these allegations do not present sufficient facts to survive Defendants' Motion to Dismiss. Because the Court has concluded that Plaintiffs have not stated a cause of action for wrongful termination or non-renewal under the PMPA on the merits, the Court need not address whether Shell and Equiva are proper defendants. The case is dismissed as to all Defendants for failure to state a claim under the PMPA as discussed in the preceding sections of this ruling.

## IV. *CONCLUSION AND ORDER*

Under the facts of this case, all Plaintiffs fail to state a cause of action for wrongful

13. It is noted that each of the district courts cited by Plaintiffs permitted the plaintiffs to proceed in the absence of an actual termination or non-renewal, but ultimately granted summary judgment in favor of the defendants on the merits, holding that there was no evidence that the terms of the new agreements violated the PMPA.

14. The Ninth Circuit's decision in *Pro Sales* has not been adopted in this Circuit, and this Circuit has not given any indication whether it would do so.

15. To the extent Abrams Shell did not sign the new agreements, but has *not* been terminated, the cases cited by Plaintiff are wholly inapposite.

termination or non-renewal under the PMPA. It is therefore

**ORDERED** that Defendants' Motion to Dismiss [Doc. # 42] is **GRANTED** and all of Plaintiffs' claims against all Defendants are **DISMISSED with prejudice.**

The Court will issue a separate final judgment.