Joseph A. PALMIERI

v.

MOBIL OIL CORPORATION

Anthony MORIN

v.

MOBIL OIL CORPORATION

Civ. Nos. H–81–898, H–81–928.

United States District Court,
D. Connecticut.

Jan. 8, 1982.

Richard W. Farrell, Albert J. Barr, Abate, Fox & Farrell, Stamford, Conn., for plaintiffs.

William E. Glynn, Scott P. Moser, John A. Danaher, III, Day, Berry & Howard, Hartford, Conn., for defendant.

RULING ON PLAINTIFFS' MOTIONS
FOR A PRELIMINARY INJUNCTION

CLARIE, Chief Judge.

The plaintiffs Joseph Palmieri and Anthony Morin seek to enjoin the defendant Mobil Oil Corporation ("Mobil") from terminating their respective franchise agreements until such time as their claims for permanent relief have been adjudicated. In this consolidated action, they claim that

the Petroleum Marketing Practices Act[1] ("PMPA"), as enacted by Congress, imposes a legal duty on petroleum franchisors like Mobil to act in a reasonable, nonarbitrary manner when dealing with their franchisees and that Mobil has violated that duty. Mobil argues that the PMPA requires only that a franchisor must not discriminate against individual franchisees, nor should it purposefully act so as to force particular franchisees out of business when negotiating rental terms and policies. Mobil maintains that it has satisfied this legal burden.

The Court finds that the plaintiffs have failed to meet their statutory burden under the PMPA, because they have been unable to demonstrate convincingly that a substantial question exists as to whether Mobil has selectively and purposefully discriminated against them when implementing its new rental policy and accordingly the plaintiffs' motions for a preliminary injunction are denied.

### Facts

Palmieri and Morin have operated retail gasoline stations in Connecticut under franchise agreements with the defendant Mobil prior to the recent expiration of such agreements. Palmieri's lease actually terminated on November 30, 1981, while Morin's lease expired on December 5, 1981. Both plaintiffs continue to operate their service stations without leases, per Court order, pending the resolution of this application for injunctive relief.

Under the terms of their now expired franchise agreements, both plaintiffs had agreed that in consideration for the exclusive use of a three bay Mobil service station, together with the opportunity to sell Mobil gasoline and related petroleum products at their respective locations, they would pay Mobil according to the terms of a contractually established rental formula. Mobil recently adopted a new formula to apply to the rental package that it now offers to its retail dealers when their franchises come up for renewal. Under this formula, Mobil projects the gasoline profit center ("GPC") and alternate profit center ("APC") for each franchisee and the sum of these two components determines the franchisee's monthly rental.[2]

Mr. Palmieri and Mr. Morin were informed by Mobil in 1980 that this new rental formula would be included in the computation of their monthly rental when their franchise agreements came up for renewal in 1981.[3] Mobil reached this business decision without consulting or negotiating any terms of agreement with either plaintiff, and concededly offered its new rental package to these men on a "take it or leave it" basis. Indeed, Mobil did not consider the actual gasoline and other retail sales that these stations had recorded, but rather it determined the volume of sales that they should have achieved according to Mobil projections. As a result of Mobil's newly adopted rental formula and sales projections, the monthly rental for Mr. Palmieri and Mr. Morin under the proposed franchise agreements would have increased substantially.[4]

---

1. 15 U.S.C. § 2801 et seq.

2. Mobil determines a franchisee's Alternate Profit Center ("APC") by projecting a reasonable profit margin for each of the products, excluding gasoline, that a franchisee may sell at his location, including for example, soda, batteries, tires, etc. A franchisee's Gasoline Profit Center ("GPC") is determined by multiplying a franchisee's projected gasoline profit margin per gallon (Mobil here has used a 17.7¢ profit margin, the margin that both Palmieri and Morin were charging in January of 1981) by the DOE's defined base volume (the DOE computed a volume figure for each service station in 1978) and applying the product of this formula to a rent schedule adopted by Mobil.

3. Mr. Palmieri's franchise expired on November 30, 1981 and Mr. Morin's expired on December 5, 1981. Both plaintiffs continued to operate their service stations, as per Court order, pending the resolution of this application for injunctive relief.

4. Under the terms of Mobil's franchise proposal, Mr. Palmieri's monthly rental conceivably could increase from the present amount of $1,250.00 to $5,964.00, amounting to a 377% increase in monthly rental over the three year term of the franchise. Mr. Morin's monthly rental could be increased by 125% under the terms of Mobil's franchise proposal to him. See Plaintiffs' Proposed Findings of Fact, at 21, 22.

Mobil concedes that if the full monthly rental increase, as defined by the franchise proposal, were charged to the plaintiffs, it would be financially onerous if not impossible for these men to pay such rent. Mobil has assured its franchisees orally, however, that they will not actually be charged this maximum rent, unless market conditions change abruptly and higher rentals are warranted. Mobil also has implemented several incentive programs for its franchisees, including a temporary rental maximum (70% of the prior year's volume in the month in question multiplied by 1.6¢) and volume discounts (4¢ for each gallon of gasoline that a dealer sells in excess of 70% of their volume for the prior year and 6¢ for each gallon that a dealer sells in excess of 90% of his prior year's volume) to enable its franchisees to earn what Mobil considers to be a reasonable profit. The fact remains, however, that under the defendant's franchise proposal, the plaintiffs' monthly rental could be raised unilaterally by Mobil up to the maximum rent plus 20%, as permitted under the contract. The defendant's lease thus affords franchisees like the plaintiffs no protection from the purely subjective discretionary monetary decisions by Mobil to increase or decrease the monthly rental within the "range" provided for in the lease agreement. Mobil responds that there has been no selective discrimination against either of these two franchisees, because all of the franchisees in the southern New England District and, in fact, throughout the several states across the country have had leases tendered to them based upon the same formula.

When this proposal was communicated to the plaintiffs, both men refused to sign the revised rental agreements. Mobil promptly informed Palmieri and Morin that their franchises would terminate when their present agreements expired unless they accepted the new proposed lease. The plaintiffs responded to the defendant's notice of termination by commencing this action, claiming that the PMPA imposes a duty on franchisors to act in a nonarbitrary, nondiscriminatory manner when implementing changes in franchise agreements and that Mobil had violated this legal standard. Specifically, they have argued that the PMPA requires that Mobil use reasonable, economically realistic figures for a petroleum retailer's profit margin and gasoline sales volume in its proposed rental formulas. Palmieri and Morin testified that the defendant's rental formula, based upon a 17.7¢ retail profit margin and 1978 Department of Energy defined base volume,[5] is patently unrealistic under present competitive market conditions.[6] They argue that the 17.7¢ profit margin and DOE volume figures are unrealistic because several factors, including government deregulation of the petroleum industry, greater consumer conservation measures, and rising prices have contributed to increased competition, lower sales volume, and decreased profit margins. The plaintiffs testified further that they could not operate their businesses on a profitable basis, if such onerous financial terms were included in their franchise agreements.

Mobil has objected to the plaintiffs' request for injunctive relief, claiming that a petroleum franchisor must be afforded some economic flexibility when dealing with its independent retail franchisees given the volatile nature of the petroleum industry, where price, supply and demand often are subject to rapid fluctuation. The defendant maintains that its proposed formula accomplishes this economic objective by providing for a rental maximum, together with a rental "range",[7] which enables

5. The Department of Energy last monitored the gasoline volume of each independent gasoline station in 1978.

6. The plaintiffs contend that these calculations are patently untenable. They argue that increasing competition within the industry renders a 17.7¢ profit margin excessive and that 1978 DOE volume figures are unrealistic in

light of increasing consumer conservation and the Reagan Administration's decision, effective January 21, 1981, to decontrol gasoline prices.

7. Mobil assures its dealers that they will not be charged the maximum rent under the franchise agreement unless market conditions change abruptly and higher rentals are warranted. Mobil also has implemented several incentive pro-

Mobil to increase or decrease a franchisee's monthly charges in response to changing market forces. Finally, and more importantly for purposes of this litigation, Mobil argues that the good faith duty imposed by the PMPA requires only that franchisors not discriminate between individual franchisees, nor act with evil purpose to terminate or fail to renew a dealer's franchise.

These arguments as offered by the respective parties highlight the fundamental issue to be resolved here. The Court must decide whether Congress, when enacting the PMPA, intended to hold petroleum franchisors strictly accountable for the reasonableness or arbitrariness of their actions, when negotiating franchise agreements or alternatively whether the legislature intended that the PMPA would serve a more limited function, namely, to protect franchisees from selective and purposeful discrimination by franchisors.

### Discussion

When considering the legal rights and duties imposed by the PMPA, this Court's legal analysis properly must begin with a brief explanation of the relationship between franchisors and franchisees in the retail petroleum industry. The typical franchise agreement is prepared by the franchisor without consulting the franchisee and contains rental terms that are imposed unilaterally by the franchisor. The franchisee is confronted often with the unenviable choice of agreeing to onerous rental terms or risking the termination of his franchise and the loss of his accumulated goodwill and livelihood.

Recognizing this potential for abuse within the petroleum franchise relationship,

Congress enacted the PMPA to provide some protection for the independent gasoline retailer.[8] Within the PMPA's comprehensive legislative framework, § 102(b) was adopted specifically to address situations, as here, where franchisor elects to terminate or fails to renew the franchise agreement. This section permits a franchisor to terminate or fail to renew its franchise only where, after appropriate notice,[9] "such nonrenewal is based upon a ground described in paragraph (2) or (3)." Paragraph (3), the relevant section for purposes of this litigation, provides in pertinent part:

"For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of determinations by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship."

The parties, as alluded to earlier,[10] dispute the scope of the "good faith" legal obligation imposed by this provision. The plaintiffs maintain that § 102(b)(3) requires that a franchisor act in a nonarbitrary, objectively reasonable manner when implementing changes in the franchise agreement. The defendant, on the other hand, argues that § 102(b)(3) imposes a more limited duty on franchisors, a duty simply to act without evil motive or discriminate

grams for dealers, including a temporary maximum (70% of the prior year's volume in the month in question multiplied by 1.6¢) and volume discounts to dealers (4¢ for each gallon of gasoline they sell in excess of 70% of their prior year's volume and 6¢ for each gallon of gasoline they sell in excess of 90% of their prior year's volume). Mobil is free nonetheless, under the terms of the franchise agreement, to unilaterally raise the price of the monthly rental, leaving its franchisees largely dependent that it will act fairly.

8. *See* generally Senate Report No. 95–731, 95th Cong., 2d Sess. ("Senate Report"), 15–19, 29–43 reprinted in [1978] U.S.Code Cong. and Admin.News, pp. 873, 873–77, 887–901.

9. 15 U.S.C. § 2804. The parties do not dispute that the notice requirements of the PMPA have been satisfied here.

10. *See* text at 1–6 *supra*.

against selective franchisees. In light of these conflicting interpretations of the legal duties imposed by the PMPA, the Court's duty is to ascertain the Congressional intent when enacting this statute and specifically to construe § 102(b)(3) to give effect to that legislative will. *Munno v. Amoco Oil Company*, 488 F.Supp. 1114, 1118 (D.Conn. 1980); *see Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 607, 99 S.Ct. 1905, 1910, 60 L.Ed.2d 508 (1975).

The legislative history of the PMPA provides ample evidence of the general policy reasons supporting Congress' decision to enact the PMPA.[11] Specifically, Congress recognized that the franchise relationship in the petroleum industry is disproportionately weighted in favor of the franchisor:[12]

"Central to the problems faced by franchisees in this regard is the disparity of bargaining power which exists between the franchisor and the franchisee. This disparity results in franchise agreements which some franchisees have argued amount to contracts of adhesion. The provisions of the contract between the franchisor and the franchisee and the permeating influence of these contracts over nearly every major aspect of the franchisee's business may translate the original disparity of bargaining power into continuing vulnerability of the franchisee to the demands and actions of the franchisor."

Upon concluding that petroleum franchisees should be accorded some legislative protection, Congress then had to decide precisely how much protection should be offered to franchisees, especially in those situations where the franchisor seeks to terminate or fails to renew the franchise relationship. When the members of the House Subcommittee on Energy and Power confronted this issue, two major proposals were considered. The initial draft of the PMPA included language allowing termination where:[13]

"(t)he franchisor and the franchisee fail to agree to reasonable changes or additions to the provisions of the franchise, unless such failure is the result of the franchisor's insistence upon such changes or additions for the primary purpose of preventing the renewal of the franchise relationship."

This proposal, as its language suggests, would have required franchisors like Mobil to act in an "objectively reasonable" manner when implementing contract revisions or terminating franchises. The House Subcommittee ultimately rejected this test, however, and adopted a "good faith" legal standard under § 102(b)(3), signaling a legislative movement away from "objective reasonableness" toward "subjective intent":[14]

"At this point it is appropriate to note that considerable debate has focused upon recognition of so-called 'reasonable business judgments' of the franchisor as grounds for termination or non-renewal. This standard has not been adopted by the committee. Instead, a two-fold test has been utilized to judge certain specified determinations including that of market withdrawal.

"One test is whether the determination was made 'in good faith'. This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made 'in the normal course of business.' Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory

---

11. See note 8 *supra*.

12. Senate Report No. 95–731, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 873, 876.

13. H.R. 130, 95th Cong., 1st Sess. (1977), *reprinted in* Petroleum Marketing Practices; Hearings Before the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce, on H.R. 130 *et seq.*, 95th Cong., 1st Sess. 11–12 (1977).

14. Senate Report No. 95–731, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 873, 895–96.

termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself."

This language, quoted from the legislative history of the PMPA, suggests quite clearly that § 102(b) of the PMPA was intended by Congress to protect franchisees *only* in situations where the franchisor acts with evil motive or discriminates selectively against franchisees with the intent to terminate or to nonrenew the franchise. The plaintiffs have offered no convincing evidence to prove that such selective discrimination occurred here.

The Court is confident that the franchisor's economic incentive to limit franchisee turnover and also to respond prudently to the demands of the marketplace will encourage franchisors like Mobil to offer reasonable franchise agreements. If abuses persist, however, the legislature may decide to regulate the franchise relationship more closely, but the PMPA as enacted does not vest the courts with authority to review the objective reasonableness or arbitrariness of each franchise agreement.

The Court's conclusions here are consistent with the judicial decisions in this District where legal obligations imposed by the PMPA have been at issue. In *Munno v. Amoco Oil Company*, 488 F.Supp. 1114 (D.Conn.1980), Judge Blumenfeld was asked to construe the PMPA in a situation where the franchisor Amoco unilaterally informed its franchisees that their franchise renewals would include a 200–300% increase in monthly rental charges. *Id.* at 1119. The plaintiff Munno argued that Amoco's proposed franchise terms were determined arbitrarily without reviewing his actual retail sales and that such financially onerous contract terms violated the good faith standard of the PMPA. Upon reviewing the legislative history of the PMPA, Judge Blumenfeld concluded:

"In essence then, the legislative history suggests that courts have been directed to look to the franchisor's intent rather than to the effect of its actions. If it is only using proposed changes to the lease to disguise an illegal attempt to discrimi-

nate against the franchisee and thereby drive him from business, the court is empowered to interfere. If, on the other hand, a good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace alone will govern the transaction."

After considering several decisions where the PMPA was at issue, Judge Blumenfeld further related:

"Thus, both the legislative history and the limited number of cases construing the PMPA support the conclusion that subjective good faith, *i.e.*, a 'good heart' without evil intent, is all that the statute requires of franchisors." (footnote omitted).

The Court's thoughtful opinion in *Munno* raises the precise problem that is at issue here. The plaintiffs' primary complaint is that Mobil's proposed franchise renewal is harsh and unfair. The marketplace, *not* the PMPA, will determine whether these assertions are true. The plaintiffs are free to reject Mobil's offer, and if no person in the marketplace will accept these terms, then Mobil will be forced to revise its offer. The market, *not* the PMPA, will determine whether Mobil's proposal is a prudent one.

Judge Daly of this District also has had occasion recently, in *Bellmore v. Mobil Oil Corp.*, 524 F.Supp. 850 (D.Conn.1981), to consider the franchisor's legal duties under the PMPA. In *Bellmore*, the defendant Mobil proposed a franchise renewal package to the plaintiff Bellmore that included precisely the same rental formula as the rental package offered to the plaintiffs in this action. Bellmore argued that Mobil's proposal was based upon unrealistic, arbitrary economic projections and further that he would be unable to pay these rental increases and continue to operate his business on a profitable basis. After considering the plaintiff's claims, Judge Daly concluded that Mobil's actions did not violate the PMPA because the plaintiff had failed to demonstrate that Mobil had applied its rental formula selectively and discriminatorily against him with the intent to terminate or nonrenew his franchise. The

Second Circuit, without opinion, affirmed that decision. *See Bellmore v. Mobil Oil Corp.*, Civ. No. 81–7491 (October 16, 1981).

In conclusion, both the legislative history of the PMPA and the recent decisions that have construed that statute indicate quite clearly that the PMPA provides only limited protection for a franchisee, protection from a franchisor's selective and discriminatory application of a rental formula with the intent of forcing that franchisee from the retail petroleum business. The evidence submitted by the plaintiffs fails to raise "sufficiently serious questions" of the defendant's selective application or discriminatory motives here and accordingly, the plaintiffs' motions for a preliminary injunction under 15 U.S.C. § 2805(a) are denied.[15] The temporary injunction issued by the Court is hereby dissolved effective January 19, 1982, at 10:00 a. m., thereby allowing the plaintiffs time to appeal this decision to the Second Circuit if they decide to pursue such relief.

SO ORDERED.

15. This opinion resolves the PMPA issue, but leaves unanswered a question not raised by the parties; that is, whether a proposed franchise containing rental terms that the parties concede are financially impossible for the franchisee to satisfy, but which permit the franchisor to unilaterally increase or decrease the rental during each month of the term at will, violates public policy. The PMPA does not confer upon this Court jurisdiction to decide that issue.