**ESSO STANDARD OIL COMPANY, et al., Plaintiffs, Appellants,**

v.

**DEPARTMENT OF CONSUMER AFFAIRS, et al., Defendants, Appellees.**

No. 85–1879.

United States Court of Appeals, First Circuit.

Argued April 11, 1986.

Decided June 19, 1986.

Rehearing and Rehearing En Banc Denied July 31, 1986.

Jose R. Gonzalez-Irizarry with whom Arturo J. Garcia-Sola, McConnell Valdes Kelley Sifre Griggs & Ruiz-Suria and Otto Bustelo-Garriga, Hato Rey, P.R., were on brief, for plaintiffs, appellants.

Reina Colon De Rodriguez, Acting Deputy Sol. Gen., Dept. of Justice, with whom Rafael Ortiz Carrion, Sol. Gen., Hato Rey, P.R., was on brief, for defendants, appellees.

Maximiliano Trujillo-Gonzalez, Hato Rey, P.R., on brief, for Asociacion De Detallistas De Gasolina De Puerto Rico, Inc., amicus curiae.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and YOUNG,* District Judge.

* Of the District of Massachusetts, sitting by designation.

COFFIN, Circuit Judge.

Plaintiffs-appellants, five oil companies engaged in the distribution of gasoline and other petroleum products in the Commonwealth of Puerto Rico,[1] challenge the validity of a Commonwealth regulation controlling the rents that may be charged to gasoline filling stations. Appellants claim that the regulation is preempted by the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, *et seq.* The District Court of Puerto Rico concluded that the PMPA does not preempt the Commonwealth's rent-control regulation, 622 F.Supp. 540. We affirm.

I. *The Petroleum Marketing Practices Act*

The PMPA was enacted by Congress in 1978 to protect gasoline franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises. S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873. Congress noted that the disparity of bargaining power existing between franchisors and franchisees sometimes resulted in franchise agreements that amounted to contracts of adhesion. *Id.* at 876. A number of states had already enacted legislation to address the petroleum franchise problem, and Congress sought to establish a "single, uniform set of rules" to govern the grounds for the termination or nonrenewal of franchises. *Id.* at 877.

Title I of the PMPA prohibits termination or nonrenewal of any franchise relationship except on the basis of specifically enumerated grounds and upon compliance with certain notification requirements. 15 U.S.C. §§ 2802–04. One of the acceptable grounds for nonrenewal, relevant to this case, is failure by the franchisee and franchisor to agree on changes to the franchise. The changes must be "the result of determinations made by the franchisor in good faith and in the normal course of business", and must not be made solely for the purpose of forcing the nonrenewal of the franchise. 15 U.S.C. § 2802(b)(3)(A). Congress specifically decided that the test should be whether the franchisor had acted in subjective "good faith" in requesting the changes, and not whether the demanded changes were the result of "reasonable business judgments" on the part of the franchisor. 1978 U.S.Code Cong. & Ad. News at 895–96. As the Senate Report to the bill explained, "[t]hese tests provide adequate protection of franchisees from arbitrary or discriminatory termination or nonrenewal, yet avoid judicial scrutiny of the business judgment itself." *Id.* at 896. *See also Palmieri v. Mobil Oil Corp.,* 529 F.Supp. 506, 509–11 (D.Conn.1982) (discussing legislative history of PMPA), *aff'd,* 682 F.2d 295 (2d Cir.1982); *Munno v. Amoco Oil Co.,* 488 F.Supp. 1114, 1118–20 (D.Conn.1980) (same).

Because the "good faith" requirement requires merely that a franchisor not act "with evil motive or discriminate[ ] selectively against franchisees", *Palmieri,* 529 F.Supp. at 511, courts have upheld franchisor demands for rent increases ranging from 100% to 300% when those demands were made in accord with established rental formulas applied to all franchisees and not for the purpose of selectively terminating a particular franchisee. *See Palmieri,* 529 F.Supp. at 509–11; *Munno,* 488 F.Supp. at 1118–20; *Bellmore v. Mobil Oil Co.,* 524 F.Supp. 850, 853–54 (D.Conn.1981); *Ferriola v. Gulf Oil Corp.,* 496 F.Supp. 158, 162–63 (E.D.Penn.1980); *Pearman v. Texaco,* 480 F.Supp. 767, 772 (W.D.Mo. 1979); *Kesselman v. Gulf Oil Corp.,* 479 F.Supp. 800, 803–04 (E.D.Pa.1979). The courts noted that the PMPA gave the franchisees no cause of action even when such radical increases in rent appeared objectively or commercially unreasonable. *Bellmore,* 524 F.Supp. at 853–54; *Ferriola,* 496 F.Supp. at 162–63; *Pearman,* 480 F.Supp. at 772. As one court pointed out, the demands of the marketplace and a franchisor's economic incentive to limit franchise turnover should encourage fran-

---

1. The five companies are Esso Standard Oil, the Shell Company (Puerto Rico) Limited, Compa- nia Petrolera Chevron, Mobil Oil Caribe, and Gulf Petroleum.

chisors to offer reasonable franchise agreements. *Palmieri*, 529 F.Supp. at 511. If abuses in franchise demands continued, the court commented, "the legislature may decide to regulate the franchise relationship more closely, but the PMPA as enacted does not vest the courts with authority to review the objective reasonableness ... of each franchise agreement." *Id.*

## II. *The Rent Control Regulation*

In contrast to the PMPA, the rent control regulation enacted by the Commonwealth of Puerto Rico does seek to regulate a substantive element of the franchise agreement. In March 1981, the Department of Consumer Affairs (DOCA) of the Commonwealth of Puerto Rico promulgated "Regulations to Determine the Rent to be Paid by Gasoline Filling Stations" (Regulation 2758). Section 5 of the Regulation states that the rental rate of a retail gasoline filling station "shall be established by agreement between the lessor and the lessee", taking into account seven listed criteria including the amount of the investment made by the lessor, the market value of the property, the former rental rate, and the net income derived by the lessee. Section 6 of the Regulation provides that if the parties, "after negotiation, are unable to reach an agreement regarding the amount of rent, either of them may file a petition in the Department [DOCA] ... for the determination and fixing of the rent." Under Section 7 of the Regulation, DOCA sets a rent based on a formula with a number of variables. This rent stays in effect for four years, unless either party files a petition for a redetermination of the rent because of a substantial change in any of the elements that comprise the established formula. Regulation 2758, Section 9. Regardless of whether the rent is set by agreement between the parties or by DOCA, the rental rate may never exceed ten percent of the market value of the leased filling station. Regulation 2758, Section 10.

If rent negotiations between a franchisor and franchisee fail, and the franchisee petitions DOCA to set a rental rate, the franchisor can choose to terminate the franchise as long as the requirements of the PMPA are met. Thus, if the original rent increase sought by the franchisor had been made in "good faith" and "in the ordinary course of business", and the franchisee had refused to agree to the new rate and had instead petitioned DOCA, the franchisor may terminate or not renew the franchise regardless of the objective unreasonableness of its original rental demand. As DOCA made clear in its brief and at oral argument, any rent proceedings pending before DOCA would be moot once a franchise had been properly terminated under the PMPA, and such proceedings would come to a halt. The franchisor would then be free to negotiate with a different franchisee. That franchisee could also petition DOCA for a rental rate, but then clearly would face the possibility of not receiving the franchise. Alternatively, the franchisee could choose to accept the rent requested by the franchisor, even if such rent is higher than the rate DOCA would have fixed.[2] In no case, however, could the rental rate exceed ten percent of the market value of the filling station.

## III. *Preemption*

The oil companies argue that the PMPA preempts Regulation 2758 because the PMPA expressly gives companies the right to demand any rent they wish as a predicate for renewal or continuation of a fran-

**2.** As this matter comes before us prior to DOCA ever actually concluding an enforcement proceeding under Regulation 2758, we make the assumption that the narrow interpretation of the Regulation advanced by its counsel in argument before us is the one that would be followed by DOCA. We therefore conclude only that the Regulation, on its face and as interpreted by DOCA's counsel, is not preempted by the PMPA. It is significant, for example, that implicit in the argument of DOCA's counsel is the concession that, during the term of a rental period established by DOCA pursuant to § 9C of the Regulation, a franchisor may still terminate its lease in accordance with the PMPA and enter into a lease with a new franchisee at a rental rate higher than the rate previously established by DOCA for the four year period.

chise, within the very limited constraints of "good faith" and "in the ordinary course of business." In contrast, they argue, Regulation 2758 effectively restricts the maximum rents that franchisors can charge. The companies point out that Congress, in passing the PMPA, sought to strike a balance between the competing interests of the franchisors and franchisees, and they contend that Regulation 2758 impermissibly skews that balance in favor of franchisees.

The primary objective of the PMPA was to protect franchisees from arbitrary and discriminatory terminations. 1978 U.S. Code Cong. & Ad.News at 873–77. Nevertheless, there is no doubt that Congress was also concerned with retaining some flexibility for franchisors. As the Senate Report accompanying the bill pointed out: "Legislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in circumstances." 1978 U.S.Code Cong. & Ad.News at 877. Thus, in the specific area of termination and nonrenewal, Congress struck a balance between franchisors and franchisees: franchisors could not terminate or refuse to renew a particular franchise on a discriminatory basis, but franchisors could demand across-the-board changes from their franchisees without being subjected to judicial evaluation of whether those changes were the result of "reasonable business judgments".

The question presented by this case is whether the balance struck by the PMPA in the area of termination and nonrenewal also impliedly gives franchisors a substantive right to be free of state regulation of all elements of the franchise agreement. We do not believe it gives such protection. In the PMPA, Congress expressly set out the preemptive scope of that legislation: it stated that no state or local entity could adopt any provision regarding the termination or nonrenewal of franchises, or regarding the notification required for termi-

nation or nonrenewal, unless such a provision was the same as that of the PMPA. 15 U.S.C. § 2806. Thus, the only grounds on which a franchisor can terminate or not renew a franchise, and the only grounds on which a franchisee can contest the termination or nonrenewal of a franchise would be those set out by the PMPA.

One court, commenting on the preemptive scope of the PMPA, noted that "[b]y specifying with such precision when the states must stand aside in favor of federal regulation, Congress implicitly marked out the bounds of the power it intended to exercise. Beyond those limits, state regulation may claim full federal approbation." *Exxon Corp. v. Georgia Ass'n of Petroleum Retailers*, 484 F.Supp. 1008, 1017 (N.D. Ga.1979), *aff'd sub nom. Exxon Corp. v. Busbee*, 644 F.2d 1030 (5th Cir.1981). Thus, through its express preemption provision, Congress indicated that it did not intend "to preempt all state provisions involving the substantive aspects of petroleum-products franchises." *Lasko v. Consumers Petroleum of Connecticut, Inc.*, 547 F.Supp. 211, 216 (D.Conn.1981).

The preemption provision of the PMPA would clearly invalidate any DOCA regulation that set rental rates for a franchise *and then* did not allow a franchisor to terminate or not renew a franchise if it did not wish to accept that established rate. That is, any law that gave a franchisee a cause of action to contest a termination of a franchise, when that termination would otherwise be valid under the PMPA, would be preempted by the PMPA. In the case before us, however, a franchisor remains free to terminate or not renew a franchise if it does not wish to accept the rent established by DOCA. The Commonwealth's rent control regulation gives neither franchisees nor franchisors rights or responsibilities in the specific area of termination or nonrenewal greater than those granted by the PMPA.

Rather than governing terminations or nonrenewals, Regulation 2758 controls a substantive element of the franchise agree-

ment. There is no indication from either the language of the PMPA or its legislative history that Congress intended to preempt all state regulation of specific components of the franchise agreement, including rent. Indeed, the discussion in the House of Representatives prior to passage of the PMPA reflects an emphasis on protecting the rights of powerless franchisees, and it would have been contrary to that primary objective of the PMPA for Congress to have desired that the bill actually reduce protection for franchisees by preempting all substantive state regulation. *See* 123 Cong.Rec. H10383–88 (daily ed. April 5, 1977). One Member of Congress made a point of emphasizing that the preemption aspect of the PMPA would be minimal and would "not preempt the heart" of the state statute currently in effect in his home state of Minnesota. 123 Cong.Rec. H10388 (statement of Rep. Frenzel).

In two cases in which state substantive controls of franchises have been challenged as preempted by the PMPA, the courts have upheld such controls, concluding that Congress did not intend to preempt all state regulation through passage of the PMPA. *See Exxon Corp*, 484 F.Supp. at 1018 (Georgia statute forbidding franchisors from requiring a franchisee to operate more than six days per week or more than 12 hours per day not preempted by the PMPA); *Lasko*, 547 F.Supp. at 216 (Connecticut law requiring all franchises to be for a minimum of three years, and if not properly terminated or nonrenewed, to be automatically renewed for three years, not preempted by the PMPA). In both of the challenged statutes, the state law applied "to the duration, or one of the substantive terms of a franchise agreement, and not to the grounds for termination or nonrenewal, nor to the kinds of notice which a franchisor must afford a franchisee." *Lasko*, 547 F.Supp. at 216.

We think it worth noting that the franchisors in *Lasko* had argued that the absence of a minimum term for franchises in the PMPA indicated a "conscious decision by Congress not to define or regulate the termination or nonrenewal of franchises in

that manner," 547 F.Supp. at 216. In response, the court stated that "the conclusion to be drawn from Congress's decision not to establish a minimum term of franchises is not that Congress meant to prohibit such terms altogether, ... but rather that Congress intended that such substantive terms be worked out by the parties themselves and/or be regulated by the States." *Id.* at 217. Similarly, in our case, the fact that Congress did not choose to use the PMPA to regulate the reasonableness of rents does not reflect an intention to prohibit all such regulation by other governmental entities. We find no authority to support the proposition that the PMPA grants to the franchisor a right to set the rent free of all regulation.

Both cases effectively respond to the argument made by the oil companies that franchisors must be free under the PMPA to respond to market conditions, i.e., to raise rents if the market will permit. Obviously a state's requirement limiting a franchisee's work day and week (*Exxon*) or requiring minimum three year terms (*Lasko*) restricts franchisors' flexibility to exploit market conditions. So also would a state's action in raising its tax on gasoline. Rent regulation would seem to be a restraint of the same nature. We cannot bring ourselves to believe that the PMPA was intended *sub rosa* to invalidate all state legislation impacting on franchisors. State regulation that may affect the profitability of a non-terminated franchise, but does not preclude the franchisor's ability to terminate the franchise relationship, is outside the sphere Congress sought to occupy in enacting the PMPA.

In essence, the oil companies' argument boils down to a contention that, as a practical matter, the rent control regulation eliminates their ability to terminate a franchise if franchisees do not agree to "good faith" rent increase demands. The companies point out that, even if they terminate a franchisee who petitions DOCA for a rental rate, any new franchisee could subsequently go to DOCA for a similar rate and thus the terminations would become meaning-

less. Although we agree that the rent control regulation reduces the franchisors' flexibility, we do not agree that it effectively destroys their power of termination, thus conflicting with the purposes and objectives of the PMPA. *Cf. Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (federal law preempts state regulation that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). The regulation does not, in fact, eliminate the power of termination that a franchisor can wield. If a franchisor consistently terminates franchisees who do not agree to any rent above that which would be fixed by DOCA, and the market can accept a higher price than the fixed rent, we think it is likely that the franchisor will ultimately find a franchisee who will not seek a rental rate from DOCA but will rather negotiate directly with the franchisor. If franchisors in Puerto Rico do not find such franchisees, or if the franchisors conclude that it is simply too unprofitable to adhere to the cap of ten percent of market value imposed on all rental rates, including those arrived at by mutual agreement (section 10 of the Regulation), the franchisors can choose to terminate all their franchisees and close down all their gasoline stations in Puerto Rico. This would be the ultimate wielding of the power of termination, to which the Commonwealth would in all likelihood respond by changing the regulation.

In sum, the Commonwealth's rent control regulation legitimately governs a substantive element of franchise agreements. It remains clear of the preemptive scope of the PMPA by allowing franchisors to continue to terminate and refuse to renew franchises on the specific grounds allowed by the PMPA. The district court's opinion is *affirmed.*