# United States Court of Appeals

## For the First Circuit

No. 05-1254

ESSO STANDARD OIL COMPANY (PUERTO RICO),

Plaintiff, Appellee,

v.

JOSÉ H. MONROIG-ZAYAS
D/B/A MONROIG SERVICE STATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Lipez, Circuit Judges.

Víctor P. Miranda-Corrada, for appellant.
Angel E. Rotger-Sabat, with whom Maymí, Rivera & Rotger,
P.S.C. was on brief, for appellee.

April 12, 2006

**TORRUELLA, Circuit Judge**. This appeal concerns a dispute under the Petroleum Marketing Practices Act ("PMPA"). 15 U.S.C. §§ 2801 et seq. The PMPA "was enacted by Congress in 1978 to protect gasoline franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises." Esso Standard Oil Co. v. Dep't of Consumer Affairs, 793 F.2d 431, 432 (1st Cir. 1986). "Congress noted that the disparity of bargaining power existing between franchisors and franchisees sometimes resulted in franchise agreements that amounted to contracts of adhesion." Id.

Plaintiff Esso Standard Oil Company (Puerto Rico) ("Esso") had a franchise agreement with defendant José H. Monroig-Zayas ("Monroig"). Esso and Monroig could not agree to the terms of a renewal agreement, and Esso sought a declaratory judgment from the district court that it had satisfied the requirements of the PMPA. In turn, Monroig asked for a preliminary injunction under the PMPA to maintain the franchise relationship. The district court denied Monroig's request for a preliminary injunction, and Monroig appeals. We affirm.

## I. Background

Beginning in January 1996, Monroig ran an Esso gas station as a franchisee. Under a three-year contract from January 1, 2001 to January 1, 2004, Monroig paid monthly rent of $3,831. On July 11, 2003, Esso sent Monroig a contract for a new three-year lease that would begin on January 1, 2004. Under this

contract, the rent increased by about five percent for each of the first two years (to $4,035 and $4,235) and did not further increase the third year. Other modifications included the removal of a radiator repair shop from the premises and a prohibition against assignment or sublease of the premises. Monroig disputed the terms of the renewal. On September 30, 2003, Esso sent Monroig a notice of nonrenewal based on the parties' failure to agree to the terms of the renewal.

For the purpose of continuing negotiations, Esso granted five short-term extensions to the prior contract. The last extension expired on June 30, 2004, and since the parties had not come to an agreement, Esso stopped delivering gasoline the next day.

## II.  Notice Under the PMPA

Under the PMPA, the franchisor must provide adequate notice to the franchisee of the nonrenewal of the franchise agreement. The general rule is that notice must be given at least 90 days before the nonrenewal takes effect. 15 U.S.C. § 2804(a)(2). An exception to this general rule allows the franchisor to provide notice on the earliest, reasonably practicable date where the circumstances make a 90-day notice unreasonable. Id. § 2804(b)(1). The district court did not address the notice requirements, stating that Monroig did not "allege that . . . the notice was somehow defective." Because our review of the record

-3-

indicates that Monroig did indeed press this point below, we now address the issue.

Other aspects of the PMPA must be considered in conjunction with the notice requirements. The PMPA offers a preliminary injunction standard to franchisees that is more forgiving than the common law standard, see id. § 2805(b)(2), but in order to take advantage of this more forgiving standard, the franchisee's request must be timely, see id. § 2805(b)(4). The timeliness of the franchisee's request for a preliminary injunction depends on the notice it received. If a franchisee receives at least 90 days notice, then it has 90 days from the date of its receipt of the notice to file a preliminary injunction motion. Id. § 2805(b)(4)(A). If a franchisee receives less than a 90-day notice, then it has 30 days from the date of the nonrenewal to file a preliminary injunction motion. Id. § 2805(b)(4)(C).

The existing franchise agreement between Esso and Monroig was due to expire on January 1, 2004, and Esso sent Monroig a notice of nonrenewal 90 days before this date. Absent other circumstances, this notice would clearly have been sufficient under § 2804(a)(2). Esso argues that it complied with the PMPA and that Monroig was required to seek a preliminary injunction by January 1, 2004. Monroig argues that the notice was essentially revoked by Esso because the parties continued to negotiate for six more months, until June 30, 2004. Further, Monroig contends that the

statute should not be construed to require him to seek a preliminary injunction while in the midst of negotiating a renewal.

We think that the circumstances of this case justify the application of the alternative notice requirements of § 2804(b)(1). In the absence of any extensions to the original contract, Esso had complied with the PMPA's notice requirements. This notice is not revoked by the parties' mutual agreement to extend the original contract for the purpose of continuing negotiations. Monroig knew very well that the failure to come to an agreement on the terms of the renewal meant an end to the franchise relationship. Monroig did not know, however, the definitive date of the nonrenewal until the contract negotiations permanently ceased. The PMPA requires the franchisor to include in its notice "the date on which . . . nonrenewal takes effect." Id. § 2804(c)(3)(B). Under these circumstances, we find that Esso gave notice to Monroig of the definitive date of nonrenewal on the earliest, reasonably practicable date. See id. § 2804(b)(1).

We believe that this outcome supports the policy concerns underlying the PMPA. A franchisor who initially satisfies the notice requirements of § 2804(a)(2) and then continues negotiations with a franchisee is not penalized for its efforts to reach a compromise agreement. In addition, a franchisee is not required to file a preliminary injunction motion while negotiations are

ongoing, which would not be conducive to fostering an agreement between the parties.  See id. § 2805(b)(4)(C).

### III.  Preliminary Injunction Standard

We now address the proper standard for determining whether the preliminary injunction should be granted.  Esso urges the common-law standard, see Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004), and Monroig urges the standard outlined in the PMPA, see 15 U.S.C. § 2805(b)(2).  The PMPA authorizes a standard for granting preliminary injunctions that is more forgiving than the common law standard, but in order to benefit from this standard, the franchisee must be timely in its request for a preliminary injunction.  See id. § 2805(b)(4).  The PMPA does not specify what a district court should do if the franchisee is tardy in its request.  To determine the proper standard, we must determine whether Monroig was timely and, if not, what the proper course of action should be.

### A.  Timeliness

Given our discussion of the notice requirements, above, we have no problem finding that Monroig did not timely seek a preliminary injunction. Pursuant to our determination that Esso gave notice to Monroig on the earliest, reasonably practicable date under § 2804(b)(1), Monroig had 30 days from the nonrenewal to timely request a preliminary injunction.  Id. § 2805(b)(4)(C). Monroig requested a preliminary injunction on September 9, 2004,

-6-

which was more than 30 days after the nonrenewal date of June 30, 2004.

### B. Standard for an Untimely Request

The PMPA does not provide much guidance to courts considering an untimely request for a preliminary injunction. The PMPA merely states that "the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was [not timely] commenced." Id. § 2805(b)(4). No circuit court has yet addressed this issue. The district court below noted that other district courts have taken three different approaches when the franchisee is tardy in seeking equitable relief: (1) "outright dismissal of the franchisee's claim for equitable relief"; (2) reliance "in part upon the franchisee's failure to timely commence an action in denying equitable relief"; and (3) "adjudge the request under the common law standard." See Esso Std. Oil Co. (P.R.) v. Monroig Zayas, 352 F. Supp. 2d 165, 171 (D.P.R. 2005). The district court found the third option "to be the better reasoned approach" and applied the common-law standard. Id. We agree with the district court that this is the proper approach.

In the absence of the more forgiving preliminary injunction standard described in the PMPA, courts would apply the common-law standard, which does not include any specific time limitations. Congress created the PMPA to rectify "the disparity

of bargaining power existing between franchisors and franchisees." Dep't of Consumer Affairs, 793 F.2d at 432. By creating a more forgiving preliminary injunction standard in the PMPA, Congress gave more power to franchisees. We do not think that Congress intended to give with one hand and take away with the other. Applying the common-law standard to untimely requests for injunctions therefore comports well with the underlying purpose of the PMPA.

## IV. Preliminary Injunction

We now apply the common-law standard. We weigh four factors in determining whether a preliminary injunction should be granted:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Bl(a)ck Tea Soc'y, 378 F.3d at 11 (internal quotation marks omitted). The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor. Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become

-8-

matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). The district court denied the preliminary injunction, and we review for abuse of discretion. Id.

The district court addressed only the first factor, finding that Monroig had not shown a substantial likelihood of success on the merits. We agree with the district court's determination and find it unnecessary to address the remaining factors. To this end, we now address the likelihood of success on the merits.

The PMPA lists several grounds under which a franchisor can choose not to renew a franchise agreement. One such ground is the "failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise." 15 U.S.C. § 2802(b)(3)(A). In negotiating any changes or additions to the franchise agreement, the franchisor must have acted (1) "in good faith and in the normal course of business" and (2) not for the purpose of "preventing the renewal of the franchise relationship." Id. Monroig's only argument is that Esso acted in bad faith during the negotiations.[1]

The requirement that a franchisor act "in good faith and in the normal course of business" is not a stringent one. The test

---

[1] Monroig's passing reference in his brief to the second requirement is not sufficiently developed to preserve the argument for appeal.

is whether the "franchisor had acted in subjective good faith in requesting the changes, and not whether the demanded changes were the result of reasonable business judgments." Dep't of Consumer Affairs, 793 F.2d at 432 (internal quotation marks omitted). Congress sought to "provide adequate protection of franchisees from arbitrary or discriminatory termination or nonrenewal, yet avoid judicial scrutiny of the business judgement itself." Id. We have found that the "good faith requirement requires merely that a franchisor not act with evil motive or discriminate selectively against franchisees." Id. (internal quotation marks and brackets omitted).

Monroig has not borne his burden to show that Esso did not act in good faith. Monroig speculates that Esso might have violated Puerto Rico regulations that limit the amount of rent that may be charged to gasoline filling stations. Monroig further faults Esso's failure to show that it had complied with these regulations. However, it is Monroig who bears the burden of proof. He could have discovered the necessary information to ascertain whether Esso complied with the regulations but did not do so. He cannot now use such speculation to establish a lack of good faith.[2]

---

[2] We do not make any statement as to whether compliance with the Puerto Rico regulations is relevant to whether Esso acted in good faith.

-10-

Monroig also points to an apparent clerical error by Esso that was revealed during the preliminary injunction hearing. He characterizes this error as manipulation of data and argues that it is evidence of bad faith. Given that the error was in Monroig's favor and resulted in a lower rent than what he should have been charged, we do not find this error relevant. Monroig also faults Esso for not producing the testimony of the person who discovered the error, but as the district court noted, Monroig made no attempt to call this person as a witness.

Finally, Monroig urges that Esso's bargaining tactics showed an absence of good faith. He notes that at one point in the negotiations "Esso took its interest in a rent increase off the table" only to bring it up again "four months later when significant progress had been made in the negotiations and an agreement was imminent." Such bargaining does not rise to the level of an "evil motive" and not even remotely indicative of bad faith. In contrast, the rent increases proposed by Esso were five percent for each of the first two years and zero percent for the final year. In light of the fact that courts have upheld rent increases of 100 to 300 percent, see Dep't of Consumer Affairs, 793 F.2d at 432, Esso's modest request suggests that it negotiated in good faith.

Monroig also argues that the district court committed error in applying the common-law standard without giving notice to

the parties of its intent to do so.  Having only argued the PMPA standard, Monroig claims he was denied the opportunity to fully argue his case before the district court.  We find this assertion meritless for three reasons.  First, under either standard, Monroig was required to show some level of success on the merits.[3]  Thus, his arguments going to the merits would have been the same under either standard.  Second, even if we had applied the PMPA standard, we would still have denied the injunction, because Monroig has utterly failed to present any evidence of bad faith on the part of Esso.  Finally, Monroig had the opportunity to argue the common-law standard on appeal, and he has not explained how he was prevented from presenting any relevant evidence before the district court.

**Affirmed**.

---

[3]    Under the PMPA standard, Monroig was required to show "sufficiently serious questions going to the merits," 15 U.S.C. § 2805(b)(2), while under the common law standard, he was required to show his likelihood of success on the merits.